# United States Court of Appeals
## For the First Circuit

No. 19-2282

MASSACHUSETTS DEPARTMENT OF TELECOMMUNICATIONS AND CABLE,

Petitioner,

v.

FEDERAL COMMUNICATIONS COMMISSION,

Respondent,

and

CHARTER COMMUNICATIONS, INC.,

Intervenor.

PETITION FOR REVIEW OF AN ORDER OF
THE FEDERAL COMMUNICATIONS COMMISSION

Before[*]

LYNCH, <u>Circuit Judge</u>,
and SARIS,[**] <u>District Judge</u>.

<u>David C. Kravitz</u>, Deputy State Solicitor, with whom <u>Maura Healy</u>, Attorney General, was on brief, for Petitioner.
<u>James M. Carr</u>, Counsel, with whom <u>Makan Delrahim</u>, Assistant Attorney General, <u>Michael F. Murray</u>, Deputy Assistant Attorney General, <u>Robert B. Nicholson</u>, Attorney, <u>Steven J. Mintz</u>, Attorney, the <u>United States Department of Justice</u>, <u>Ashley S. Boizelle</u>, Acting General Counsel, <u>Richard K. Welch</u>, Deputy Associate General Counsel, <u>Adam G. Crews</u>, Counsel, and the <u>Federal</u>

---

[*] While this case was submitted to a panel that included Judge Torruella, he did not participate in the issuance of the panel's opinion. The remaining two panelists therefore issued the opinion pursuant to 28 U.S.C. § 46(d).

[**] Of the District of Massachusetts, sitting by designation.

Communications Commission were on brief, for Respondent.

Howard J. Symons, with whom Jessica Ring Amunson and Jonathan A. Langlinais were on brief, for Intervenor.

Rick C. Chessen, Neal M. Goldberg, Mary Beth Murphy, and Radhika Bhat on brief for NCTA – The Internet & Television Association, amicus curiae.

————————————————

December 18, 2020

————————————————

**SARIS, District Judge.** The Massachusetts Department of Telecommunications and Cable ("MDTC") petitions for review of an adverse FCC order dated October 25, 2019. The MDTC challenges the FCC's determination that the cable system operated by Charter Communications, Inc. ("Charter") in Massachusetts is subject to "effective competition" in its franchise areas under the statutory "Local Exchange Carrier" ("LEC") Test, Telecommunications Act of 1996, § 301(b)(3)(C), 47 U.S.C. § 543(l)(1)(D) (2018). Congress prohibits cable rate regulation when the FCC makes this finding. 47 U.S.C. § 543(a). Charter has intervened in opposition to the MDTC's petition. The Internet & Television Association has submitted a brief as amicus curiae supporting the respondent-intervenor and affirmance. We conclude that the petition for review should be denied.

## I. BACKGROUND

### A. Statutes and Regulations

Congress created a framework for regulating cable television in the Cable Communications Policy Act of 1984 ("1984 Cable Act") by adding Title VI to the Communications Act of 1934. Pub. L. No. 98-549, 98 Stat. 2779 (codified as amended at 47 U.S.C. § 543 (2018)). As originally enacted, 47 U.S.C. § 543 directed the FCC to "prescribe and make effective regulations which authorize a franchising authority to regulate rates for the provision of basic cable service in circumstances in which a cable

- 3 -

system is not subject to effective competition." Id. § 2 (codified as amended at 47 U.S.C. § 543(b)(1)). Congress left the definition of "effective competition" to the FCC's regulations. Id. (codified as amended at 47 U.S.C. § 543(b)(2)(A)). Under the FCC's 1985 regulations, "cable systems in approximately 96 percent of all communities were not rate regulated." H.R. Rep. No. 102-628, at 31 (1992). From 1986 to 1992, "average monthly cable rate[s] . . . increased almost 3 times as much as the Consumer Price Index." Cable Television Consumer Protection and Competition Act of 1992, Pub. L. No. 102-385, 106 Stat. 1460, § 2(a)(1) ("1992 Cable Act").

In response, Congress enacted the 1992 Cable Act. While Congress "strongly prefer[red] competition and the development of a competitive marketplace to [rate] regulation," H.R. Rep. No. 102-628, at 30 (1992), it acknowledged that there was "no certainty" that "competition to cable operators with market power [would] appear any time soon." S. Rep. No. 102-92, at 18 (1991). The amended 47 U.S.C. § 543 included a paragraph entitled "PREFERENCE FOR COMPETITION" stating: "If the Commission finds that a cable system is subject to effective competition, the rates for the provision of cable service by such system shall not be subject to regulation by the Commission or by a State or franchising authority under this section." Pub. L. No. 102-385, 106 Stat. 1460, § 3(a) (codified as amended at 47 U.S.C.

- 4 -

§ 543(a)(2)).  Under the statute, effective competition exists where one of three tests is met: 1) the Low Penetration Test, (2) the Competing Provider Test, and (3) the Municipal Provider Test. Id. (codified as amended at 47 U.S.C. § 543(l)(1)).  The FCC's 1993 regulations adopted a rebuttable presumption that cable operators were "not subject to effective competition." Implementation of Sections of the Cable Television Consumer Protection and Competition Act of 1992: Rate Regulation, 8 FCC Rcd 5631, 5670 ¶ 43 (1993).  A cable operator had the burden to rebut the presumption "with evidence of effective competition" in its franchise area.  Id. at ¶ 42.

Congress "expanded[ed] the effective competition test for deregulating" cable rates under 47 U.S.C. § 543 in the Telecommunications Act of 1996, Pub. L. No. 104-104, 110 Stat. 56 ("1996 Act").  S. Rep. No. 104-230, at 170 (1996) (Conf. Rep.); see 47 U.S.C. § 521(6) (enumerating as one of the purposes to "promote competition in cable communications and minimize unnecessary regulation that would impose an undue economic burden on cable systems").  As the Supreme Court stated, "its primary purpose was to reduce regulation and encourage the rapid deployment of new telecommunications technologies."  See Reno v. ACLU, 521 U.S. 844, 857 (1997) (pointing out that the statute was designed to promote, among other things, competition in the multi-channel video market).  The 1996 Act added a fourth effective competition

test focusing on competition from providers of local telephone service. Called the Local Exchange Carrier Test, it provides that effective competition exists when

> a local exchange carrier or its affiliate (or any multichannel video programming distributor using the facilities of such carrier or its affiliate) offers video programming services directly to subscribers by any means (other than direct-to-home satellite services) in the franchise area of an unaffiliated cable operator which is providing cable service in that franchise area, but only if the video programming services so offered in that area are comparable to the video programming services provided by the unaffiliated cable operator in that area.

47 U.S.C. § 543(l)(1)(D). The LEC Test is the effective competition test at issue in this case.

The FCC's regulations provide that a competing video programming service will be "deemed offered" under the LEC Test if (1) the distributor is "physically able to deliver service to potential subscribers, with the addition of no or only minimal additional investment by the distributor, in order for an individual subscriber to receive service," and (2) "no regulatory, technical or other impediments to households taking service exist, and potential subscribers are reasonably aware that they may purchase" the competing service. 47 C.F.R. § 76.905(e)(1)-(2) (2020). The regulations define "comparable" service as offering "at least 12 channels of video programming, including at least one

- 6 -

channel of nonbroadcast service programming." Id. § 76.905(g).[1]

A cable operator can "file a petition for a determination of effective competition with the [FCC]." 47 C.F.R. § 76.907(a). With respect to franchise areas where cable rate regulation is contested, the cable operator "bears the burden of demonstrating the presence of such effective competition." Id. § 76.907(b).

## B. The FCC Order

On September 14, 2018, Charter, a cable operator, filed a petition with the FCC seeking a determination that it faces effective competition in its franchise areas in Massachusetts and Kauai, Hawaii. See id. § 76.907(a). Charter's petition alleged

---

[1] In 2015, the FCC amended its regulations to adopt a rebuttable presumption that effective competition exists in each franchise area under the Competing Provider Test. Amendment of the Commission's Rules Concerning Effective Competition, 30 FCC Rcd 6574, 6577-82 ¶¶ 6-10 (2015); see Nat'l Ass'n of Telecomms. Officers & Advisors v. FCC, 862 F.3d 18, 29 (D.C. Cir. 2017) (rejecting petition challenging the amendment). The Competing Provider Test is satisfied where "at least two unaffiliated multichannel video programming distributors each . . . offer[] comparable video programming to at least 50 percent of the households in the franchise area" and more than fifteen percent of households in the franchise area subscribe "to programming services offered by multichannel video programming distributors other than the largest multichannel video programming distributor." 47 U.S.C. § 543(l)(1)(B). That test is not at issue in this case. The FCC did not adopt a presumption that the other statutory tests for effective competition were satisfied. Id. at 6582 ¶ 10. Only Kauai, Hawaii and thirty-two franchise areas in Massachusetts rebutted the Competing Provider presumption. Petition for Determination of Effective Competition in 32 Massachusetts Communities and Kauai, HI (HI0011), 34 FCC Rcd at 10230. Cable rate regulation thus continued only in those franchise areas.

- 7 -

that the availability of DIRECTV NOW[2] in those franchise areas constitutes effective competition under the LEC Test. DIRECTV NOW is a video programming service that provides live television and on-demand programs via a broadband internet connection. DIRECTV NOW is offered by DIRECTV, which is an affiliate of AT&T.

Charter argued that DIRECTV NOW satisfies the LEC Test because (1) DIRECTV is a subsidiary of AT&T and therefore affiliated with LECs owned by AT&T; (2) DIRECTV is physically able to deliver DIRECTV NOW "to any current Charter-serviced household that wishes to subscribe" given that broadband internet service is "available to virtually 100 percent of Charter's customers in the Franchise Areas," and customers are reasonably aware of its availability; and (3) DIRECTV NOW is comparable to Charter's cable service because DIRECTV NOW "offers subscribers a minimum of 65 channels."

The Massachusetts Department of Telecommunication and Cable and the State of Hawaii filed oppositions to Charter's petition. Charter filed a reply to those oppositions. During meetings with FCC staff, Charter confirmed that if its petition were granted, it would raise the monthly rate for its basic cable service to $23.89. Then current regulated monthly rates ranged from $12.49 to $23.99. In contrast, the lowest price of a DIRECTV

_____

[2] According to Charter, DIRECTV NOW was recently rebranded as AT&T TV NOW.

- 8 -

NOW package was $40 per month.  The FCC granted Charter's petition on October 25, 2019 and issued a Memorandum Opinion and Order concluding that Charter had proven effective competition under the LEC Test in Kauai, Hawaii and the thirty-two franchise areas in Massachusetts. [3]  <u>Petition for Determination of Effective Competition in 32 Massachusetts Communities and Kauai, HI (HI0011)</u>, 34 FCC Rcd 10229, 10229 (2019).  It made the following key findings:

First, the FCC found that DIRECTV NOW is provided by a "LEC affiliate" due to AT&T's common ownership of DIRECTV NOW and LECs.  <u>Id.</u> at 10232.  MDTC does not dispute this finding.

Second, the FCC found that DIRECTV NOW is "offered" in the franchise areas because "DIRECTV is 'physically able' to deliver DIRECTV NOW to subscribers via existing broadband facilities in the Franchise Areas" and "no regulatory, technical or other impediments to households taking" DIRECTV NOW exist in the franchise areas.  <u>Id.</u> at 10233-34; <u>see</u> 47 C.F.R. § 76.905(e)(1)-(2).  The FCC found that the cost of broadband service is not an impediment to households subscribing to DIRECTV NOW.

The FCC found that DIRECTV NOW is offered "directly to subscribers" because DIRECTV has "an unmediated relationship" with

---

[3] This appeal involves only the Massachusetts communities.

subscribers through direct marketing, subscription, billing, and payment.  Petition for Determination of Effective Competition in 32 Massachusetts Communities and Kauai, HI (HI0011), 34 FCC Rcd at 10237.  In the FCC's view, there is no facilities-based restriction on how a LEC affiliate delivers service given the provision that a LEC or its affiliate can provide effective competition by offering video programming service "by any means," the term used in the statute.  Id. at 10241.

Third, the FCC found that DIRECTV NOW is "comparable" to Charter's cable service because DIRECTV NOW "provides packages starting with access to 45 channels" including "both local broadcast channels and nonbroadcast channels."  Id. at 10238; see 47 C.F.R. § 76.905(g) (regulation defines comparable as offering at least twelve channels with one nonbroadcast channel).  The FCC determined that the term "channels" in the FCC regulation "can refer to 'programming sources'" based on its "colloquial meaning."  Petition for Determination of Effective Competition in 32 Massachusetts Communities and Kauai, HI (HI0011), 34 FCC Rcd at 10243.

## II.  STANDARD OF REVIEW

Under the Administrative Procedure Act ("APA"), a court "may only overturn" an agency decision if the court finds the decision "was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'"  City of Taunton v. EPA,

895 F.3d 120, 126 (1st Cir. 2018) (quoting 5 U.S.C. § 706(2)(A) (2018)). "'[T]he APA standard affords great deference to agency decision making' and 'the [agency's] action is presumed valid.'" Int'l Jr. Coll. of Bus. & Tech. v. Duncan, 802 F.3d 99, 106 (1st Cir. 2015) (quoting Associated Fisheries of Me., Inc. v. Daley, 127 F.3d 104, 109 (1st Cir. 1997)).

When an issue "turns on questions implicating an agency's construction of the statute which it administers," we "apply the principles of deference described in Chevron, USA, Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842 . . . (1984)." Garcia v. Sessions, 856 F.3d 27, 35 (1st Cir. 2017) (cleaned up). At the first step we "ask whether 'Congress has directly spoken to the precise question at issue.'" Succar v. Ashcroft, 394 F.3d 8, 22 (1st Cir. 2005) (quoting Chevron, 467 U.S. at 842). "If so, courts, as well as the agency, 'must give effect to the unambiguously expressed intent of Congress.'" Id. (quoting Chevron, 467 U.S. at 842–43). "[I]f the statute is silent or ambiguous with respect to the specific issue," we proceed to the second step of the analysis. Chevron, 467 U.S. at 843. At the second step, "if the implementing agency's construction is reasonable, Chevron requires a federal court to accept the agency's construction of the statute." Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs., 545 U.S. 967, 980 (2005). The MDTC does not dispute this standard.

The Supreme Court has long followed a deferential standard in reviewing an agency's interpretation of its own regulation. See Bowles v. Seminole Rock & Sand Co., 325 U.S. 410, 414 (1945). In Auer v. Robbins, the Supreme Court reiterated that an agency's interpretation of its own regulation is "controlling unless plainly erroneous or inconsistent with the regulation." 519 U.S. 452, 461 (1997) (cleaned up). In a split decision, the Supreme Court further explained the standard for judicial review of an agency's interpretation of its own regulation:

> [A] court must apply all traditional methods of interpretation to any rule, and must enforce the plain meaning those methods uncover. There can be no thought of deference unless, after performing that thoroughgoing review, the regulation remains genuinely susceptible to multiple reasonable meanings and the agency's interpretation lines up with one of them. And even if that is the case, courts must on their own determine whether the nature or context of the agency's construction reverses the usual presumption of deference. Most notably, a court must consider whether the interpretation is authoritative, expertise-based, considered, and fair to regulated parties.

Kisor v. Wilkie, 139 S. Ct. 2400, 2419 (2019).

### III. ANALYSIS

### A. Offer Video Programming Directly to Subscribers

The MDTC argues that the FCC erred because DIRECTV NOW does not "offer" video programming services "directly to subscribers" as the LEC Test required, and that is because the FCC's own regulations provide that the word "offer" encompasses the delivery of video. See 47 C.F.R. § 76.905(e)(1). Because

- 12 -

DIRECTV NOW is delivered via broadband internet service provided by a third party, the MDTC contends that DIRECTV NOW is providing services indirectly and cannot satisfy this requirement. Specifically, the MDTC argues a LEC affiliate must use its own facilities in the franchise area to offer a competing service to satisfy the LEC Test. DIRECTV NOW's reliance on third-party delivery matters, the MDTC explains, because the requirement of direct delivery reflects the "purpose of the LEC Test: to recognize the competitive threat from local telephone companies, which are already hardwired into most households."

In its Order, the FCC concluded that DIRECTV NOW met the statutory requirement that the competing video programming service must be offered in the franchise area. <u>Petition for Determination of Effective Competition in 32 Massachusetts Communities and Kauai, HI (HI0011)</u>, 34 FCC Rcd at 10232. It did so by applying the definition of "offer" in its regulation. Under the first part of the regulatory definition of "offer," a competing provider must be "physically able to deliver service to potential subscribers, with the addition of no or only minimal additional investment by the distributor, in order for an individual subscriber to receive service." 47 C.F.R. § 76.905(e)(1). Because "DIRECTV is 'physically able' to deliver DIRECTV NOW to subscribers via existing broadband facilities in the Franchise Areas," the FCC concluded that DIRECTV NOW satisfies this delivery requirement.

- 13 -

Petition for Determination of Effective Competition in 32 Massachusetts Communities and Kauai, HI (HI0011), 34 FCC Rcd at 10233.

The FCC rejected the argument that a LEC affiliate must directly deliver its service using its own facilities to satisfy the LEC Test. Id. at 10233, 10241. The FCC pointed out that the word "facilities" appears in the statutory provision inside a parenthetical that refers to "any multichannel video programming distributor using the facilities" of a LEC or its affiliate -- that is, those distributors that are not themselves LECs or LEC affiliates. Id. at 10239 n.65; see 47 U.S.C § 543(l)(1)(D). In contrast, the FCC emphasized that the provision broadly provides that a LEC or LEC affiliate may offer "services directly to subscribers by any means (other than direct-to-home satellite services)." Petition for Determination of Effective Competition in 32 Massachusetts Communities and Kauai, HI (HI0011), 34 FCC Rcd at 10241; see 47 U.S.C § 543(l)(1)(D) (emphasis added); see generally SAS Inst., Inc. v. Iancu, 138 S. Ct. 1348, 1354 (2018) (holding that the word "any" carries "an expansive meaning" (citation omitted)). The MDTC's argument is unpersuasive. Most importantly, as the FCC points out, the statute contains no facilities-based test, and Congress expressly provided that video programming services could be offered "by any means." 47 U.S.C. § 543(l)(1)(D). The MDTC's interpretation of the parenthetical

would defeat the operative term of the statute "by any means." Cf. Chickasaw Nation v. United States, 534 U.S. 84, 94–95 (2001) (quoting Cabell Huntington Hosp., Inc. v. Shalala, 101 F.3d 984, 990 (4th Cir. 1996)) ("A parenthetical is, after all, a parenthetical, and it cannot be used to overcome the operative terms of the statute."). The MDTC cites to earlier versions of the legislation and report language to support its position, see S. Rep. 104-230, at 170 (Conf. Rep.) (providing four examples of means of delivery that satisfied the LEC test, "all of which were facilities-based"), while the FCC underscores other portions of the same report, see id. (indicating that the language "'by any means' includes any medium (other than direct-to-home satellite service) for the delivery of comparable programming," including various kinds of distributor services) (cleaned up). Here the plain language of the statute, "by any means," precludes a facilities-based test.[4] See Succar, 394 F.3d at 22 (stating that "courts, as well as the agency, 'must give effect to the

---

[4] In its brief, citing Brand X, the FCC suggests that terms like "offer" are ambiguous because they admit of "two or more reasonable usages." See Brand X, 545 U.S. at 989. Given that ambiguity, the FCC argues that its reading of the term "offer" in Section 543(l)(1)(D) is entitled to deference. See Chevron, 467 U.S. at 843. Charter disagrees and argues that the term "offer" is not ambiguous in the LEC Test. Regardless of whether the term is ambiguous in some contexts, here the term is defined by regulation, and no one has argued that the regulation is unreasonable.

unambiguously expressed intent of Congress'" (quoting <u>Chevron</u>, 467 U.S. at 842-43)).

The parties also debate the meaning of the word "directly." While acknowledging that "directly" is not defined in the statute, the FCC concluded in its Order that the "best reading" of the requirement that a LEC or LEC affiliate offer video programming service "directly to the subscribers" is that the LEC affiliate "must have (or offer to have) a direct customer relationship with consumers in the franchise area." <u>Petition for Determination of Effective Competition in 32 Massachusetts Communities and Kauai, HI (HI0011)</u>, 34 FCC Rcd at 10237(internal quotation marks omitted). In light of the context that "directly" modifies "offer" (i.e. "offers video programming directly to subscribers") the FCC concluded that "Congress intended for there to be an unmediated relationship between the LEC affiliate and the customer." <u>Id.</u>

The MDTC interprets "directly" as modifying the regulatory definition of "offer," requiring the physical delivery of services by the LEC or its affiliate without a third party broadband provider. The MDTC argues that the FCC's statutory interpretation of "directly to subscribers" should not be given deference because the FCC applied it to a definition of "offer" that is different from the definition in its regulation. However, the FCC's focus here is on the words "directly to subscribers."

Petition for Determination of Effective Competition in 32 Massachusetts Communities and Kauai, HI (HI0011), 34 FCC Rcd at 10236. The plain meaning of those words supports the FCC's interpretation of the statute. See American Heritage Dictionary 257 (3rd. ed. 1992) (defining "directly" as "in a direct line or manner" or "without anyone or anything intervening"). Further, as the MDTC concedes, Congress uses the "by any means" adverbial phrase to refer to various means by which video can be delivered to subscribers. Even if the MDTC's interpretation of the term "directly to subscribers" were "reasonable" under Chevron Step Two, the Court must defer to the FCC's reasonable construction. See Chevron, 467 U.S. at 843.

### B. **Cost as Impediment**

The MDTC argues that the FCC acted arbitrarily and capriciously by failing to consider "the affordability of internet service" in addition to the cost of the DIRECTV NOW service as an impediment to customers relying on basic cable service. Without regulation by Massachusetts, the MDTC emphasizes, Charter's basic cable rates are likely to double for some consumers. The MDTC emphasizes that subscribers to basic cable are often the poorest segment of the population and vulnerable to losing cable access due to a price increase. The problem is exacerbated because DIRECTV NOW requires subscribers to have a broadband internet subscription, which costs significantly more than basic cable.

- 17 -

The MDTC contends that roughly twenty percent of households in the franchise areas do not have broadband internet service.  For this reason, the MDTC argues that cost is an impediment for the poorest subscribers to basic cable.

In its Order, the FCC concluded that DIRECTV met the second part of the "offer" rule -- that "no regulatory, technical or other impediments to households taking service exist" because no regulatory or technical barriers "prevent or inhibit consumers from subscribing."  Petition for Determination of Effective Competition in 32 Massachusetts Communities and Kauai, HI (HI0011), 34 FCC Rcd at 10234.  Specifically, it found that the cost of broadband internet service was not an impediment to households taking DIRECTV NOW in the franchise areas.  While it recognized that "some consumers may not want or be able to" pay for broadband, the FCC noted that the record showed that the vast majority of households in Massachusetts and Hawaii already have broadband.  Id. at 10235.

Further, the FCC concluded that a consumer's expenditures on "additions" such as a broadband internet connection to receive programming are not an impediment to service. Id. at 10235-36.  Rather, it found that the LEC Test can be met "in circumstances that require reasonable customer-provided additions . . . to receive programming."  Id.  It relied on an earlier ruling that "requiring customers to purchase a satellite

- 18 -

dish to receive satellite service" was not "an impediment to finding that the competing service was offered in the franchise areas." Id. at 10235; see Implementation of Section of the Cable Television Consumer Protection and Competition Act of 1992: Rate Regulation, 8 FCC Rcd at 5659-60.[5]

Based on this precedent, and widespread internet availability, the FCC reasonably concluded that a household's need to purchase broadband internet service to access DIRECTV NOW is not an "impediment[]" within the meaning of its regulation. Petition for Determination of Effective Competition in 32 Massachusetts Communities and Kauai, HI (HI0011), 34 FCC Rcd at 10234-35. Importantly, the FCC did not take the position that the cost of a customer-provided addition could never be an impediment within the meaning of its regulation. Id. Rather, it reasonably found that the widespread use of broadband undermines the argument that the customer-provided investment to gain broadband access was an "impediment[]" within the meaning of the regulation. Id. Thus the FCC did not act arbitrarily and capriciously in determining

---

[5] The MDTC criticizes the FCC because it provided no information about the cost of satellite dishes. The FCC responded that the MDTC had to file a motion for reconsideration pursuant to 47 U.S.C. § 405(a) to raise this point. The Court need not address this argument because the FCC stated that "the fact that broadband access constitutes a separate cost does not mean" that DIRECTV NOW is not offered under the LEC test. Petition for Determination of Effective Competition in 32 Massachusetts Communities and Kauai, HI (HI0011), 34 FCC Rcd at 10244.

- 19 -

that no "impediment[]" exists.  See Motor Vehicle Mfrs. Ass'n of U.S., 463 U.S. at 43.

**C. "Channels"**

The parties duel over the meaning of the word "channels." The MDTC argues that the FCC's finding is arbitrary because DIRECTV NOW does not provide "channels" as that term is defined in one provision of the 1984 Cable Act, which is stated in terms of an electromagnetic frequency spectrum.  See 47 U.S.C. § 522(4) ("[T]he term 'cable channel' or 'channel' means a portion of the electromagnetic frequency spectrum which is used in a cable system and which is capable of delivering a television channel.").  It relies on American Civil Liberties Union v. FCC, which held that the FCC did not have discretion "to adopt, as part of its regulations implementing the Cable Act, a definition of a particular term that is at odds with a definition of that very term contained in the Act itself."  823 F.2d 1554, 1567 (D.C. Cir. 1987).

The LEC Test provides that the video programming services offered by the LEC or its affiliate must be "comparable to the video programming services provided by the unaffiliated cable operator in that [franchise] area."  47 U.S.C. § 543(l)(1)(D).  As can be seen, the statutory test does not use the term "channels."  Id.  The FCC regulation defines "comparable" video programming as "at least 12 channels of video programming,

including at least one channel of nonbroadcast service programming." 47 C.F.R. § 76.905(g). In its Order, the FCC found that DIRECTV NOW offered comparable programming to Charter because it provided packages with access to forty-five channels including both broadcast channels and nonbroadcast channels. Petition for Determination of Effective Competition in 32 Massachusetts Communities and Kauai, HI (HI0011), 34 FCC Rcd at 10237-38.

The MDTC's argument is unpersuasive on this point. Congress left the definition of "comparable" under the LEC Test to the FCC's regulations. See 47 U.S.C. § 543(b)(2). In its order, the FCC interpreted the term "channels" in its regulations using the term's "colloquial meaning." Petition for Determination of Effective Competition in 32 Massachusetts Communities and Kauai, HI (HI0011), 34 FCC Rcd at 10243. The FCC was not unreasonable when it looked to the ordinary meaning of the regulatory term rather than the statutory definition of channel used for a different purpose in the 1984 Cable Act. See Kisor, 139 S. Ct. at 2415-18. American Civil Liberties Union is easily distinguishable. In deciding comparability of programming sources, the FCC is reasonable in concluding consumers are choosing between competing video programming providers like NBC, CBS, or ESPN, not transmission paths. See id.; Petition for Determination of Effective Competition in 32 Massachusetts Communities and Kauai, HI (HI0011), 34 FCC Rcd at 10243. Further, the FCC

reasonably argues that using electromagnetic frequency "which is used in a cable system" would be a meaningless way to assess effective competition to "cable operators." Finally, in a related context, the FCC has consistently understood comparability to refer to programming sources. Implementation of Section of the Cable Television Consumer Protection and Competition Act of 1992: Rate Regulation, 8 FCC Rcd at 5667 n.130 ("With respect to switched networks, we construe comparability to mean at least twelve different programming sources."). Accordingly, the agency's interpretation based on the plain meaning of its own regulation is reasonable. See Kisor, 139 S. Ct. at 2415–18.

## IV. CONCLUSION

The Court **DENIES** the petition. Each party is to bear its own costs.