[No. B005697. Second Dist., Div. Five. July 29, 1985.]

CITY OF LOS ANGELES, Petitioner, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
LEONARD FRIEDMAN et al., Real Parties in Interest.

**COUNSEL**

Ira Reiner and James K. Hahn, City Attorneys, Gary R. Netzer, Senior, Assistant City Attorney, Claudia McGee Henry, Assistant City Attorney, Sharon L. Siedorf, Susan D. Pfann and Michael S. Woodward, Deputy City Attorneys, for Petitioner.

No appearance for Respondent.

Mitchell, Silberberg & Knupp, Richard S. Hessenius, Daniel M. Petrocelli, Peter B. Gelblum, Haight, Dickson, Brown & Bonesteel and Roy G. Weatherup for Real Parties in Interest.

**OPINION**

**ASHBY, J.**—In this civil action for unlawful business practices (Bus. & Prof. Code, § 17200 et seq.), the City of Los Angeles (City) contends that real parties, the present and former owners of the "Barrington Plaza" apartment complex, imposed rent increases in violation of the City's rent stabilization ordinance (RSO) (Los Angeles Mun. Code, § 151.00 et seq.). The action was brought in the name of the People of the State of California by the Los Angeles City Attorney, "acting to protect the public as consumers and competitors from unfair business practices. . . ."

In this original proceeding, we are called upon to review a discovery order pursuant to which the principal drafter of the RSO is required to answer certain questions about her work in drafting the RSO. The order also requires members of the City's rent stabilization division (RSD) to answer certain questions concerning investigations conducted prior to the filing of this action.

The City contends that the information sought is either irrelevant or privileged. Real parties seek the discovery at issue to bolster their two major defenses to this action: First, that the property in question was under the auspices of the United States Department of Housing and Urban Development (HUD), and therefore exempt from local rent control, and (2) that the city attorney knew this but nonetheless elected to file a lawsuit without standing to do so.[1] Friedman contends this action was filed with great fanfare but without any apparent basis, was politically motivated, and was designed as a face-saving device for the city attorney.

## FACTS

The Barrington Plaza is a 700-unit complex occupied primarily by senior citizens on fixed incomes. Prior to 1967, the complex was owned by HUD, which financed construction of the project in 1960. In 1967, the complex was purchased by the predecessor of real party in interest the Weingart Foundation,[2] which conveyed a one-half interest to real party Leonard Friedman. In 1982, the foundation conveyed its remaining interest to Friedman, who is now the sole owner of the complex.

In 1980, real parties imposed a 13 percent rent increase on Barrington Plaza tenants, in order to partially recover the cost of extensive capital improvements and "rehabilitation" of the complex. The RSO, which was effective April 1, 1979, permits annual rent increases of 7 percent, but increases in excess of that amount are permitted only if the subject property did not have a rental increase since before May 31, 1977. (Los Angeles Mun. Code, § 151.06(B).) Real parties had imposed a 7 percent increase prior to May 31, 1977, but due to the expiration dates of some leases, the increases did not take effect until after that date. The City contends that the 1980 increase violated the RSO because of the increases which took effect after May 31, 1977.

Real parties sought additional 7 percent increases in 1980 and 1982, but their applications were denied by the RSD because of the 13 percent increase in 1980.

---

[1]Los Angeles Municipal Code section 151.10A provides that any landlord who charges rent in excess of the legal maximum shall be liable to the tenant for three times the excess amount, with reasonable attorneys' fees and costs as determined by the court. Section B provides that said violation is also a misdemeanor, with certain stated exceptions. In this case, for reasons which become clear later on in this opinion, the City has forsaken its remedy of a criminal prosecution in favor of a civil suit. It is Friedman's contention that civil actions under the RSO are limited to aggrieved tenants and the City's exclusive remedy for violation of the RSO is a criminal prosecution.

[2]Real party John Poag is the foundation's president.

In its complaint, the City seeks an order (1) restraining real party Friedman from accepting any rents which violate the RSO, (2) requiring restitution to present and past tenants,[3] and (3) imposing a $2,500 civil penalty upon each defendant for each violation of the RSO. (According to the City, each day that the RSO is being violated constitutes one illegal act.)

In his answer to the City's complaint, Friedman admits imposing the 13 percent increase in 1980, but contends that the increase did not violate the RSO, and was made with the City's consent.

According to Friedman, real parties applied to HUD for the increase to recover expenditures for capital improvements and "rehabilitation" of the complex. HUD determined that an appropriate increase would be 14.8 percent. Real parties also submitted the request to the RSD which determined that a 13 percent increase would be sufficient. HUD thereafter adopted that figure. Thus, claims Friedman, the increase was made at the express direction of HUD and with the express approval of the RSD.

Real parties also appealed the rejection of their applications for 7 percent increases in 1981 and 1982. On appeal to the RSD's review board (which upheld the rejection of the applications), the hearing examiner concluded that (1) the 1980 increase of 13 percent was full and just compensation for the capital improvements and (2) at the time of the 1980 increase, the Barrington Plaza was under the jurisdiction of HUD.

From the record before us, it appears that in the years 1980 through 1982, the RSD received complaints from several Barrington Plaza tenants about the 13 percent rent increase at the complex. An investigation by the RSD ensued, after which the case was referred to the city attorney, who declined to file a criminal prosecution against real parties. The reasons for this came to light only after the present civil action was filed, when several city employees, including the city attorney himself, undertook to bare their souls to a reporter from the Los Angeles Times. The Times article, entitled "Bureaucratic Bungling, Convoluted History Mark Barrington Rent Case," appeared on August 13, 1983, two days after the present action was filed.[4]

The article details the RSD investigation of six tenant complaints received between 1980 and 1982 on the subject of the 13 percent rent increase in 1980. The city attorney's decision not to file a criminal action against real

---

[3]Prior to oral argument in this case, Friedman reached a settlement with the tenants, but the city attorney nevertheless vowed to pursue the case without the tenants.

[4]This article was submitted as an exhibit to the declaration of Peter B. Gelblum, Friedman's attorney.

parties was apparently due to the mistaken belief that the Barrington Plaza was under the jurisdiction of HUD, whose regulations preempted local rent control laws. In fact, HUD consistently maintained that the Barrington Plaza was always subject to municipal rent control.

In the Times article, Deputy City Attorney Susan Lefebvre admitted that she had made a mistake in rejecting the complaints, as "she was never very clear on the preemption issue." City Attorney Ira Reiner admitted that the City had little grounds for a criminal prosecution against real parties, because, as Reiner put it, "You have somebody acting, if you will, at least arguably, under the color of justification." Reiner fixed the blame for the rejection of the tenant complaints on an employee of the RSD's investigation division, who Reiner said gave the city attorney's office "incorrect information" about the relationship between the Barrington Plaza and HUD. However, Phyllis Currie, supervisor of the RSD investigators, told a different story: "Her agency . . . was ordered by the city attorney's office to tell the complainants that their cases had been rejected because the Barrington was a building receiving rent subsidies and therefore exempt from local rent control. The city attorney decided whether to file charges."

The Times article concluded with the statement, attributed to a local HUD official, that "[T]here seems to have been some miscommunication" between government agencies.

Having realized the mistake, the city attorney undertook to file the present civil action after a tenant's group was formed and a complaint was submitted to the RSD in August 1982. (A criminal prosecution was apparently not a viable alternative for the reasons stated by city attorney Reiner in the Times article.)

With this background in mind, we proceed to the discovery dispute which is the basis for the present petition.

The dispute arose during the depositions of Assistant City Attorney Claudia McGee Henry (the principal drafter of the RSO), Deputy City Attorney Susan Lefebvre, Phyllis Currie, supervisor of the RSD investigators, and RSD Investigator David Levy, all of whom declined to answer numerous questions propounded by Friedman's attorney.

Henry was asked a number of questions relating to the period during which she was drafting the RSO, including what transpired at meetings she attended, what statutes and other background material she referred to in drafting the ordinance, and what memoranda and other documents were

generated during the drafting period. These questions were objected to on relevancy grounds.

Henry also underwent extensive questioning about her role in the investigation which was the subject of the Times article (hereinafter referred to as "the prior investigation"), including what she knew about why various tenant complaints about the 13 percent increase in 1980 had been rejected. She claimed these questions were irrelevant and privileged.

Deputy City Attorney Lefebvre, who played a larger role in the prior investigation, was asked about her dealings with the RSD, her conclusions with respect to the tenant complaints, and the documents she reviewed in order to arrive at that conclusion. All of the questions put to Lefebvre were objected to on the grounds that they were irrelevant and/or constituted attorney work product.

Currie was asked whether she believed there was sufficient evidence to establish that the Barrington Plaza owners had imposed illegal rent increases, and was also asked about conversations with various RSD and city attorney personnel relating to the prior investigation. These questions were objected to on the grounds of relevance, attorney-client privilege, and Currie's privilege "as administrator in charge of investigators," (a privilege, as far as we know, unknown in the law).

Levy was asked similar questions about his role in the prior investigation, and similar objections were raised.

After Friedman brought the necessary motion to compel answers and production of documents, the dispute was submitted to a referee. The motion was granted in part and denied in part. The referee made a ruling with respect to each disputed question and set forth general guidelines as follows:

". . . Claudia McGee Henry may be questioned concerning all of the steps taken leading up to the drafting of the Rent Stabilization Ordinance, including but not limited to research that was done, such as cases, other ordinances, and federal legislation examined. If Ms. Henry identifies any writings that she reviewed, generated, or used in preparing to draft or in drafting the ordinance then all such writings must be produced to counsel for Friedman. However, counsel for Friedman may not inquire into Henry's mental processes or personal opinions.

". . . Information generated or events occurring prior to the 'cut-off date' concerning any 'prior investigations' of illegal rents at the Barrington Plaza conducted by the City Attorney, or the RSD, are relevant and are not pro-

tected by the attorney work product privilege, which does not apply, or by the attorney-client privilege, which was waived by Phyllis Currie's statements to a reporter from the Los Angeles Times as reported in an article dated August 13, 1983 attached to the Joint Statement as Exhibit 'A' to the Declaration of Peter B. Gelblum. For the purposes of this ruling, the term 'prior investigations' refers to investigations prior to August 11, 1982, the date on which the 'Levinson' tenant complaint which culminated in the present action was submitted by the RSD to the City Attorney. This is the 'cut-off date' referred to in some of the specific rulings above. Friedman is entitled to production of all writings in existence prior to the cut-off date which are identified by any of the deponents named on page 14, lines 16-18, above, concerning the 'prior investigations.'

". . . Communications wholly between or among attorneys in the City Attorney's Office, memoranda prepared by an attorney or attorneys in the City Attorney's Office and notes written by and statements made by an attorney in the City Attorney's Office concerning communications with third parties are protected from disclosure by the attorney work product privilege, if such communication and memoranda and notes occurred, or were prepared after August 11, 1982, the 'cut-off date.' "

After a lengthy hearing, the superior court adopted the referee's recommendations with only slight modification. We hold that the court's order was correct with the exception of that portion requiring Assistant City Attorney Henry to answer questions and to provide documents generated during the drafting stage of the RSO.

1. Under California's liberal discovery statutes, a party is entitled to discovery of information which is (1) not privileged and (2) relevant to the subject matter of the action or reasonably calculated to lead to the discovery of admissible evidence. (Code Civ. Proc., §§ 2016, subd. (b), 2031.) ■ The discovery ordered here seeks to chronicle the steps Attorney Henry took and to examine the legal authorities she consulted in drafting the RSO. Friedman contends that this information is relevant because it "bears directly on the proper interpretation of the Ordinance."

Friedman contends that such an interpretation is necessary because the RSO is ambiguous as to (1) whether the city attorney has standing to bring a civil enforcement action in view of the RSO's "express authorization to file only criminal misdemeanor cases," and (2) "whether the total control exercised over the Barrington Plaza by HUD constitutes such 'management' or 'operation' of the building as to exempt it from local rent control under specific provisions of the ordinance." Friedman also contends that the interpretation of the ordinance is crucial on the issue of whether the ordinance,

"while valid on its face, is being applied in an arbitrary and capricious manner."

By attempting to delve into the mind of the RSO's principal drafter, Friedman is trying to discover what the individual members of the city council interpreted the RSO to mean at the time they passed the ordinance. This violates one of the long-established rules of statutory construction: that the testimony of an individual legislator as to his intention, motive or opinion with regard to a particular piece of legislation is inadmissible. (*City and County of San Francisco* v. *Superior Court* (1982) 130 Cal.App.3d 481, 485-486 [181 Cal.Rptr. 775].) Legislative intent must be ascertained from the language of the statute itself; " 'if the language is clear there can be no room for interpretation and effect must be given to its plain meaning.' " (*Id.*, at p. 483.) In *City and County of San Francisco,* the successor to assassinated Mayor George Moscone asked the city's attorney for an opinion whether (1) the board of supervisors might by ordinance appropriate money to be held in trust, the income from which would be paid to the surviving dependents of elected officials who are assassinated while in office, and (2) if so, might such an ordinance operate retroactively to benefit Moscone's dependents. The city's attorney prepared a written opinion in which each of the questions was answered "yes," and such an ordinance was thereafter adopted by the board of supervisors.

The city's treasurer and controller believed that the ordinance was probably invalid as an illegal gift of public funds, and refused to implement the ordinance. The city commenced a mandamus proceeding to compel the two officials to disburse the funds. While the mandamus action was pending, a rumor circulated that the city attorney had prepared a tentative draft opinion saying that the proposed ordinance was in fact illegal, and copies of that draft were somehow broadly circulated. The city's treasurer then sought production from the city of its attorney's "legal opinion memoranda . . . concluding that [the ordinance] would constitute an illegal gift of public monies." The city rejected the request on relevancy grounds, but the superior court ordered the city to produce the document. The Court of Appeal issued a peremptory writ of mandate commanding the superior court to set aside its order.

The court held that (1) the information sought was not relevant because the intent and purpose of the ordinance was unambiguous and there was no need to delve into the legislative intent behind it, (2) since the motives or understandings of individual legislators are not considered in construing a statute, the testimony of an individual legislator with regard to his intention, motive or opinion regarding a particular piece of legislation is inadmissible, and (3) the draft opinion letter by the city's attorney was protected by Code

of Civil Procedure section 2016, subdivision (b), which provides that "any writing that reflects an attorney's impressions, conclusions, opinions, or legal research or theories shall not be discoverable under any circumstances."[5]

Friedman attempts to distinguish *City and County of San Francisco* by arguing that the ordinance is ambiguous on several points. While not a model of clarity, the RSO is not as vague as Friedman claims. For instance, one does not need to probe the mind of RSO's drafter to interpret the meaning of the words "owns, operates, or manages," words which Friedman claims need interpreting to resolve the issue of whether the Barrington Plaza was exempt from local rent control because it was "owned, operated or managed" by HUD. Even if there were some ambiguities in the ordinance, it is not for Attorney Henry to resolve them. The evolution of the statute as interpreted by Attorney Henry is simply irrelevant in determining the meaning of the ordinance ultimately passed by the city council. Where an ordinance is ambiguous it must be interpreted according to the rules of statutory construction. The intent of individual city council members is irrelevant, but even more irrelevant is the intent or interpretation of the drafting deputy city attorney.

Since the information sought from Attorney Henry is neither relevant, nor calculated to lead to the discovery of relevant evidence, the court erred in compelling discovery of such information.

In any event, the real issue here is not one of statutory interpretation; it is whether the facts of this case, examined under the plain language of the RSO, warranted the filing of the case. The discovery ordered by the court below would not resolve this issue.[6]

■ 2. The court was correct, however, in adopting the referee's recommendations with respect to questions and documents about the so-called "prior investigation" conducted by the RSD.

---

[5] Henry did not assert the work product privilege at her deposition but the City raised the issue in its petition. Since we have determined that the information sought is inadmissible on relevancy grounds, we need not address the privilege issue.

[6] The court below recognized that *City and County of San Francisco* might preclude discovery of this information. The court stated: "I have some very strong doubts that this whole subject is worth all of the time we are spending on it in light of the *City and County of San Francisco* case. I have a feeling it's much ado about nothing, because preliminary drafts, particularly two steps removed from the actual ordinance, because they are not the final draft that went to the City Council and they are not the version that the City Council adopted into the law and which the mayor then signed, are not going to be discoverable, I would think."

Relying on *People* v. *Collie* (1981) 30 Cal.3d 43 [177 Cal.Rptr. 458, 634 P.2d 534, 23 A.L.R.4th 776], the City contends that any conversations between RSD investigators and attorneys at the city attorney's office are protected under the attorney work-product doctrine. In *Collie,* the Supreme Court held that "the [work product] privilege should extend not just to the attorney's work product, but to the efforts of those who work with him to prepare the defense . . . ." (30 Cal.3d 43, at p. 59.) *Collie* is inapplicable here. With respect to the prior investigation, the RSD was acting on its own behalf and not at the direction of the city attorney. The RSD received complaints from tenants and investigated those complaints, occasionally consulting with the city attorney; it was not, as in *Collie,* the attorney's investigative arm. Thus, the attorney work-product privilege does not apply to the information sought from RSD investigators.

This brings us to the City's contention that the city attorney was acting as the RSD's attorney and therefore any statements between RSD investigators and the city attorney's office are protected by the attorney-client privilege. The referee and the trial court correctly found that any attorney-client privilege which might have existed was waived by Phyllis Currie (ostensibly the "client") in her interview with the reporter from the Los Angeles Times. This waiver analysis applies as well to information sought from Henry and Lefebvre which did not constitute their "mental impressions, conclusions, opinions, legal research or theories." Under Code of Civil Procedure section 2016, any other "work product" of an attorney is subject to a qualified, rather than absolute, privilege: the information is protected from discovery unless withholding such information would "unfairly prejudice the party seeking discovery in preparing his claim or defense, or will result in an injustice." (Code Civ. Proc., § 2016, subd. (b).) The court below conducted the "balancing test" required by section 2016 and concluded that the statements made by the city attorney, his staff and RSD investigators compelled disclosure of information relating to the prior investigation. The court stated:

"It is a matter of protection for an attorney's thought processes in terms of the balancing that we go through in preparing a case for trial. And I am willing to go along with the fact that if your office chose to publicize what it was doing and wasn't doing and why, that it would not be particularly fair under the circumstances to allow you now to clam up and not disclose what it was Mr. Reiner was talking about in his press agent release.[7]

---

[7]The court was apparently referring to a related Times article in which then City Attorney Ira Reiner was quoted as saying: " 'This [method of enforcing rent control] is a whole new ball game. . . . This is most important in terms of breaking new ground. This approach has not yet been tried in any jurisdiction in California.' " Reiner was apparently referring to the City's decision to forego criminal prosecution in favor of a civil suit for unlawful business practices.

"I am going to go along with its not being protected. And I don't care whether it is characterized as work product or attorney-client privilege, it is not protected precisely when the head of an executive agency involved chose not only to mention it, but to explain what your office was doing and why. And I think it is pretty hard in that circumstance to argue that there was no waiver. Whether a deputy can waive is one thing. When the head of the office speaks, I think it is something entirely different and much stronger."

The court recognized the injustice inherent in the City's apparent contention that the information in question was privileged for purposes of this litigation, but not privileged for purposes of a publicity campaign to the million or so readers of the Los Angeles Times. The city attorney assumed the risks inherent in trying one's case in the media.

Let a peremptory writ of mandate issue commanding the respondent court to vacate those portions of its order of April 6, 1984, requiring disclosure by way of deposition or document production of information held to be not relevant under section 1 of this opinion. The remainder of the court's order may stand.

Each party to bear its own costs.

Feinerman, P. J., and Hastings, J., concurred.

Petitions for a rehearing were denied August 27, 1985, and the petitions of City of Los Angeles and real party in interest Friedman for review by the Supreme Court were dismissed as moot on November 26, 1985. Mosk, J., did not participate therein.