Filed 1/30/26; on rehearing

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| DISNEY PLATFORM DISTRIBUTION, INC., et al.,<br><br>    Plaintiffs and Appellants,<br><br>v.<br><br>CITY OF SANTA BARBARA,<br><br>    Defendant and Respondent. | 2d Civil No. B342211<br>(Super. Ct. No. 24CV02313)<br>(Santa Barbara County)<br><br>OPINION ON REHEARING |

This appeal involves the interpretation and validity of Ordinance 5471 (the Ordinance), which was adopted by the City of Santa Barbara (City) in 2008. The Ordinance is entitled, "Telecommunications and Video Users' Tax Reduction and Modernization Ordinance."

Appellants Disney Platform Distribution, Inc., BAMTech, LLC, and Hulu, LLC, are subsidiaries of the Walt Disney Company. They provide video streaming services to their customers. Appellants allege that they "offer live and on-demand

video content that millions of subscribers can stream over the Internet."[1]

In 2022 City's Tax Administrator sent appellants a "notice of deficiency determination for video users' taxes." The notice informed appellants that they had failed to collect and pay the video users' tax due under the Ordinance for the period from January 1, 2018 through December 31, 2020. The unpaid tax plus penalties and interest was as follows: Hulu – $506,117, BAMtech – $37,270, Disney Platform Distribution – $68,950.

Appellants appealed to the City Administrator, who appointed an independent hearing officer – retired Court of Appeal Associate Justice James R. Lambden – to preside at the administrative appeal hearing. (See Santa Barbara Municipal Code (SBMC) § 4.26.170.) The hearing officer upheld the Tax Administrator's decision. Appellants sought judicial review by filing a petition for a writ of administrative mandate in the trial court. They appeal from the judgment denying their petition.[2]

---

[1] "Video streaming refers to the real-time transmission of video content over the internet. It allows users to watch videos instantly without having to download them to their devices. . . . [¶] . . . [V]ideo files are broken down into smaller chunks of data, which are then transmitted through the internet at lightning speed. The device on the viewer's end catches these packets in real-time and seamlessly puts them together, allowing viewers to enjoy non-stop playback of their . . . videos" <https://www.fastpix.io/blog/what-is-video-streaming-is-it-really-hard-to-stream-videos-online> [as of Oct. 21, 2025], archived at <https://perma.cc/5MPF-GNUU>.

[2] Before judgment was entered, appellants prematurely filed a notice of appeal from the order denying their petition.

Appellants claim the Ordinance does not apply to video streaming. They reason: "[T]he [Ordinance] . . . taxes 'video services.' As defined by the [Ordinance], 'video service' requires use of 'one or more channels' and requires the service suppliers to provide or sell a channel to a home or business. 'Channel' has a well-understood technical definition of 'transmission path' that has always excluded Internet streaming."

Appellants also contend that, if the Ordinance applies to them, it violates (1) the anti-discrimination provisions of the federal Internet Tax Freedom Act, (2) the First Amendment of the United States Constitution, and (3) Article XIII C of the California Constitution. In addition, they argue that City failed to comply with the notice requirements of Public Utilities Code section 799.[3] We affirm.

"[W]e exercise our discretion to treat the appeal as having been taken from the judgment." (*Boonyarit v. Payless Shoesource, Inc.* (2006) 145 Cal.App.4th 1188, 1190, fn. 1; see also Cal. Rules of Court, rule 8.104(d)(2).)

[3] Three amicus curiae briefs were filed on behalf of appellants. The briefs were submitted by (1) the California Taxpayers Association; (2) the Motion Picture Association, Inc., and the Streaming Innovation Alliance; and (3) the Howard Jarvis Taxpayers Association. Two amicus briefs were filed on behalf of City: one by six law professors with expertise in taxation, and the other by the League of California Cities and the California State Association of Counties. We do not consider issues raised by amici that were not raised by the parties in their appellate briefs. (See *California Building Industry Association v. State Water Resources Control Board* (2018) 4 Cal.5th 1032, 1048, fn. 12 [The general rule is that "'California courts will not consider issues raised for the first time by an amicus curiae'"];

The Ordinance provides in relevant part: "Establishment of Video Users' Tax.  There is hereby imposed a tax upon every person in the City using video services.  The tax imposed by this section shall be at the rate of five and three/quarters percent (5.75 %) of the charges made for such services and shall be collected from the service user by the video service supplier or its billing agent.  (SBMC § 4.26.050, subd. A.)  The term "'charges'" includes charges for "[v]ideo programming and video services." (*Id.*, subd. B.5.)

"Video services" is defined as "[v]ideo programming and any and all services related to the providing, recording, delivering, use or enjoyment of 'video programming' (including origination programming and programming using Internet Protocol, e.g., IPTV and IP-Video) using *one or more channels* by a 'video service supplier,' regardless of the technology used to deliver, store or provide such services . . . ."  (SBMC § 4.26.020, italics added.)

"Video programming" means "[t]hose programming services commonly provided to subscribers by a 'video service supplier' . . . ."  (SBMC § 4.26.020.)  "Video service supplier" means "[a]ny person, company, or service which provides or sells *one or more channels of video programming, or provides or sells*

---

*People v. Hannon* (2016) 5 Cal.App.5th 94, 105 ["'California courts refuse to consider arguments raised by amicus curiae when those arguments are not presented in the trial court, and are not urged by the parties on appeal.  "'Amicus curiae must accept the issues made and propositions urged by the appealing parties, and any additional questions presented in a brief filed by an amicus curie will not be considered"'"].)

*the capability to receive one or more channels of video programming*, including any telecommunications that are ancillary, necessary or common to the provision, use or enjoyment of the video programming, to or from a business or residential address in the City, where some fee is paid . . . .  A 'video service supplier' includes, but is not limited to . . . video services using internet protocol (e.g., IP-TV and IP-Video, which provide, among other things, broadcasting and video on demand), . . . whatever their technology."  (*Ibid*., italics added.)

*Interpretation of General Tax Approved by the Electorate*

The City Council placed the Ordinance on the November 4, 2008 general election ballot pursuant to the California Constitution, Article XIII C, section 2, subdivision (b) (section (2)(b)).  It was designated as "Measure G" and was approved by 70.98 percent of the voters.

The Ordinance imposes a general tax on video users. "'General tax' means any tax imposed for general governmental purposes."  (Cal. Const., art. XIII C, § 1, subd. (a).)  Article XIII C, section 2(b) provides, "No local government may impose, extend, or increase any general tax unless and until that tax is submitted to the electorate and approved by a majority vote. . . .  The election required by this subdivision shall be consolidated with a regularly scheduled general election for members of the governing body of the local government . . . ."

Our Supreme Court construed Article XIII C, section 2(b) in *California Cannabis Coalition v. City of Upland* (2017) 3 Cal.5th 924 (*Cannabis Coalition*).  The court noted: "By its terms, article XIII C, section 2 only applies to actions taken by a 'local government.'  To cabin uncertainty about what 'local government' connotes, article XIII C then defines the term to mean 'any

5

county, city, city and county, including a charter city or county, any special district, or any other local or regional governmental entity.' (*Id.*, § 1, subd. (b).)" (*Id.* at pp. 936-937.) "[N]othing in the text of article XIII C, or its context, supports the conclusion that the term 'local government' was meant to encompass the electorate." (*Id.* at pp. 946-947.)

Thus, unlike an initiative, the electorate did not *enact* the general tax imposed by the Ordinance. (See *Cannabis Coalition*, *supra*, 3 Cal.5th at p. 938 [Elections Code "section 9200 . . . provides that '[o]rdinances may be enacted by and for any incorporated city,' encompassing situations where the electorate enacts an ordinance, via initiative, *for* the city"].) Instead of enacting the Ordinance, the electorate *approved* it as required by Article XIII C, section 2(b). The ordinance was enacted by the local government entity, i.e., the City.

The rules for interpreting a voter initiative are well established: "'[W]e apply the same principles that govern statutory construction. . . . Thus, [1] "we turn first to the language of the statute, giving the words their ordinary meaning." . . . [2] The statutory language must also be construed in the context of the statute as a whole and the overall statutory scheme [in light of the electorate's intent]. . . . [3] When the language is ambiguous, "we refer to other indicia of the voters' intent, particularly the analyses and arguments contained in the official ballot pamphlet." . . . ' . . . [¶] In other words, our 'task is simply to interpret and apply the initiative's language so as to effectuate the electorate's intent.'" (*Robert L. v. Superior Court* (2003) 30 Cal.4th 894, 900-901, citations omitted, brackets in original.) "[T]he intent of the drafters may be considered by the court if there is reason to believe that the electorate was aware of

6

that intent . . . ." (*Rossi v. Brown* (1995) 9 Cal.4th 688, 700, fn. 7; see *Taxpayers To Limit Campaign Spending v. Fair Pol. Practices Com.* (1990) 51 Cal.3d 744, 764, fn. 10 ["The opinion of drafters or of legislators who sponsor an initiative is not relevant since such opinion does not represent the intent of the electorate and we cannot say with assurance that the voters were aware of the drafters' intent"].)

We have been unable to find any authority discussing how a court should interpret an ordinance that was not enacted by the electorate through the initiative process, but instead was "approved" by the electorate pursuant to Article XIII C, section 2(b). But just as the electorate's intent controls the interpretation of a voter initiative, it should also control the interpretation of a general tax approved by the electorate. The constitutional requirement that the electorate approve the tax would be meaningless if the tax could be construed in a manner inconsistent with the electorate's intent. In their petition for rehearing, appellants acknowledge that, "if the tax goes beyond what the electorate understood itself to be approving, it cannot be collected."

We therefore reject appellants' contention in their petition for rehearing that we erred in failing "to consider the City Council's intent" underlying its decision to place the Ordinance on the November 4, 2008 general election ballot. In *Cannabis Coalition, supra*, 3 Cal.5th 924, the Supreme Court said nothing to undermine our conclusion that the electorate's intent controls the interpretation of general taxes approved by the electorate pursuant to Article XIII C, section 2(b).[4]

---

[4] In *Cannabis Coalition* our Supreme Court "held . . . that [article XIII C, section 2(b)'s] requirement that local general

Moreover, appellants' interpretation of the City Council's intent is based on City officials' statements of opinion concerning the Ordinance. "[W]e must disregard a legislator's statement of opinion, understanding, or interpretation of the [ordinance]." (*Baldwin v. City of Los Angeles* (1999) 70 Cal.App.4th 819, 838; see also *Boie-Hansen v. Sisters of Charity of St. Vincent De Paul, Inc.* (1957) 152 Cal.App.2d 845, 848 ["Evidence of the intent of individual members of the legislative body cannot be resorted to for construction of the ordinance"]; *County of Santa Cruz v. City of Watsonville* (1985) 177 Cal.App.3d 831, 842 ["It is well settled that the testimony or opinions of individual members of a legislative body are inadmissible for purposes of interpreting a statute"]; *City of Los Angeles v. Superior Court* (1985) 170 Cal.App.3d 744, 753 ["Where an ordinance is ambiguous it must be interpreted according to the rules of statutory construction. The intent of individual City Council members is irrelevant"].)

*Ballot Pamphlet*

"[W]e can . . . make the . . . assumption that the voters, or at least some of them, read and were guided by the ballot materials concerning the [Ordinance]." (*People v. Morales* (2016) 63 Cal.4th 399, 406.) The official ballot pamphlet's "Impartial Analysis" stated: "Measure G would enact a City ordinance which amends the City's 1970's era UUT [Utility Users Tax] ordinance with a modern 'telecommunication and video services'

taxes must first be submitted to the electorate at a regularly scheduled general election does not apply to local voter initiatives proposing general taxes; such initiatives may be submitted to voters at a special election." (*Legislature of State of California v. Weber* (2024) 16 Cal.5th 237, 273.)

ordinance. . . . The modernized technical definitions in the Measure G ordinance would apply to all types of telecommunication regardless of whether the communication is intrastate, interstate, or international and regardless of the technology used to provide such communications. . . . The new ordinance would not apply to charges for internet services, including digital downloads like music, games, and ringtones."

The ballot pamphlet's argument for Measure G said: "Measure G is not a new tax. For almost 40 years, the current tax has helped ensure that our police and firefighters are there when we need them, and funded road repairs, youth and senior programs and other vital community services. However, the existing ordinance was enacted before the introduction of many modern telecommunication technologies. Yes on G simply replaces the existing ordinance with one that is consistent with new federal and state law, and modernizes definitions to close loopholes and ensure equal treatment for all taxpayers."

The ballot pamphlet's argument against Measure G said in part, "Santa Barbarans who believe that new technologies should not be taxed should vote No on Measure G."

*Standard of Review*

"'Section 1094.5 of the Code of Civil Procedure provides the basic framework by which an aggrieved party to an administrative proceeding may seek judicial review of any final order or decision rendered by a state or local agency.'" (*Poncio v. Department of Resources Recycling & Recovery* (2019) 34 Cal.App.5th 663, 668-669.) "We exercise independent judgment on legal issues, including the interpretation of municipal ordinances." (*Harrington v. City of Davis* (2017) 16 Cal.App.5th 420, 434; see also *Meyers v. Board of Administration etc.* (2014)

9

224 Cal.App.4th 250, 256 ["We review questions of law, such as the interpretation of local ordinances and municipal codes, de novo"].)

*The Ordinance Applies to Video Streaming*

Appellants assert that the term "'[c]hannel' is the key to the [Ordinance]." They argue, "Internet streaming is excluded because streamers do not 'provide or sell one or more channels.'"

The Ordinance does not define "channel." Appellants claim "the technical meaning of 'channel'" should prevail, and that meaning is a "'transmission path.'" Thus, the Ordinance covers providers that "deliver[] video content over internet-protocol wirelines that consist of closed networks with transmission paths built directly into subscribers' homes." Such providers "control[] the path from the video distribution source all the way to the subscribers' homes."

Appellants continue: "If Hulu, Disney+, or ESPN+ delivered videos directly to subscriber's homes, they would be covered by the [Ordinance]."[5] But "[i]nternet streaming platforms do not provide or sell a transmission path to a customer's residence or place of work; rather, customers rely on their Internet service provider ('ISP') to deliver video through the ISP's own transmission path. . . . [T]he ISP, not the Internet streaming platform, provides or sells the 'channel.'" "The customer's independently procured ISP delivers the video . . . to any of the customer's Internet-connected devices over the ISP's own facilities. [Record citations.] Customers can access Internet

---

[5] Appellant Disney Platform Distribution operates Disney+. Appellant BAMTech operates ESPN+.

10

streaming services from any Internet-connected device, wherever they happen to be."

In support of their claim that the technical definition of "channel" includes a transmission path, appellants cite the federal Cable Communications Policy Act of 1984 (1984 Cable Act), 47 U.S.C. §§ 522 (4), (7).  Section 522(4) provides, "[T]he term 'cable channel' or 'channel' means a portion of the electromagnetic frequency spectrum *which is used in a cable system* and which is capable of delivering a television channel (as television channel is defined by the Commission by regulation)." (Italics added.)  Section 522(7) provides in part, "[T]he term 'cable system' means a facility, consisting of a set of *closed transmission paths* and associated signal generation, reception, and control equipment that is designed to provide *cable service* which includes video programming and which is provided to multiple subscribers within a community . . . ."  (Italics added.)

Appellants contend that "FCC [Federal Communications Commission] regulators have . . . adopted [the 1984 Cable Act's] meaning [of 'channel']."  (See *In the Matter of Sky Angel U.S., LLC* (2010) 25 F.C.C. Rcd. 3879, 3883 ["While Sky Angel appears to interpret the term 'channel' in a non-technical sense to mean a stream of video programming, it fails to address the definitions of that term in the Act and the Commission's rules, which appear to include a transmission path as a necessary element of a 'channel'"].)

The 1984 Cable Act "created a framework for regulating cable television."  (*Massachusetts Department of Telecommunications and Cable v. Federal Communications Commission* (1st Cir. 2020) 983 F.3d 28, 30 (*Massachusetts Cable*).)  It was not intended to apply to video streaming, which

11

did not exist when it was enacted. In his administrative appeal decision, the hearing officer noted, "The 'internet' was in its infancy and largely unavailable for public use at the time of the Federal Act in 1984." The trial court observed, "[I]t is by no means apparent that the technical meaning of 'channel' in the context of cable systems under the 1984 Act is the meaning intended by the City in enacting the . . . Ordinance."

The Ordinance covers "[v]ideo programming and any and all services related to the providing, recording, delivering, use or enjoyment of 'video programming' . . . using one or more channels by a 'video service supplier,' *regardless of the technology used to deliver, store or provide such services . . . .*" (SBMC § 4.26.020, italics added.) In other words, the Ordinance applies regardless of whether the technology includes a transmission path to a customer's home, as in cable-provided video, or the customer accesses video services through the customer's ISP, as in streaming. This point was emphasized in the ballot pamphlet's impartial analysis of the Ordinance: "The modernized technical definitions in the Measure G ordinance would apply to all types of telecommunication . . . regardless of the technology used to provide such communications."

Moreover, appellants' interpretation of "channel" is inconsistent with the following excerpt from the ballot pamphlet's argument in favor of the Ordinance: "Yes on G . . . modernizes definitions to close loopholes and ensure equal treatment for all taxpayers." City justifiably contends that appellants' interpretation would create a loophole and ensure unequal treatment: "A mandate that the [Ordinance] be applied in a technologically neutral manner cannot easily be squared with the idea that the use of video services provided over the internet [via

streaming] is exempt from taxation.[6]  In Appellants' view, a *cable* subscriber in Santa Barbara who watches a game on ESPN, or a news program on CNN, or a kids show on the Disney Channel owes tax to the City, but a person watching [via streaming] the same game on ESPN+, the same news program on Hulu, or the same kids show on Disney+ does not.  The . . . Ordinance was designed to eliminate, not codify, this type of preferential tax treatment."[7]  (Italics added.)

The hearing officer concluded, "In the context of 'television' the ordinary meaning of the term 'channel' is a 'programming source' because channels are not understood to be technical transmission frequencies, but rather video programming collections offered by providers (e.g. traditional broadcasters such as NBC, CBS and ESPN)."  In support of his conclusion, the hearing officer cited *Massachusetts Cable*, *supra*, 983 F.3d 28.  This case involved DIRECTV NOW, "a video programming service that provides live television and on-demand programs via a broadband internet connection."  (*Id*. at p. 32.)  The FCC had "determined that the term 'channels' in the [applicable] FCC regulation 'can refer to "programming sources"' based on its

---

[6] In their opening brief, appellants assert that they "have absolutely no disagreement that the [Ordinance] mandates technological neutrality."

[7] In their amicus brief, the League of California Cities and the California State Association of Counties note: "In recent years, consumer behavior has shifted away from cable television service toward online video streaming, resulting in a substantial loss of cable user tax revenues for many jurisdictions.  As a result, several cities now enforce taxes on the use of video streaming services that have replaced cable television."

'colloquial meaning.'" (*Id.* at p. 33.)  The federal appellate court determined that "[t]he FCC was not unreasonable when it looked to the ordinary meaning of the regulatory term rather than the statutory definition of channel used for a different purpose in the 1984 Cable Act."[8]  (*Id.* at p. 38.)

"'[O]ur task is to effectuate the voters' intent . . . . [Citations.]'  [Citation.]  In performing this task, we look first to the words of the provision in question, giving them their natural and ordinary meaning, unless it appears they were used in some technical sense."  (*Steinhart v. County of Los Angeles* (2010) 47 Cal.4th 1298, 1318.)  "''The words must be understood, not as the words of the . . . city council, or the mayor, or the city attorney, but as the words of the voters who [approved] the [Ordinance]. They are to be understood in the common popular way, and, in the absence of some strong and convincing reason to the contrary,

---

[8] The FCC explained: "Although the Commission defines 'comparable programming' as 'at least 12 channels of video programming, including at least one channel of nonbroadcast service programming,' we conclude that the Commission did not intend this definition to incorporate the [1984 Cable] Act's definition of 'channel.'  Indeed, in adopting the definition of 'comparable programming' in the *1993 Rate Regulation Order*, the Commission indicated that the term 'channels' can refer to 'programming sources' rather than physical channels.  Thus, we find that the statutory context of the [matter before the FCC] makes clear that a colloquial meaning of 'channel' (i.e., a source of prescheduled video programming) applies to its use in our rule . . . ."  (*In the Matter of Petition for Determination of Effective Competition in 32 Massachusetts Communities & Kauai, Hi (Hi0011)* (2019) 34 F.C.C. Rcd. 10229, 10242-10243.)

14

. . . they are not entitled to be considered in a technical sense inconsistent with their popular meaning.""" (*Creighton v. City of Santa Monica* (1984) 160 Cal.App.3d 1011, 1018.)

Appellants argue, "The Impartial Analysis of the Ordinance, given to voters [in the ballot pamphlet] before election day, explained that the Ordinance would enact 'modernized technical definitions.'" Appellants are referring to the Impartial Analysis's statement, "The modernized technical definitions in the Measure G ordinance would apply to all types of telecommunication . . . ." But the Ordinance does not define the term "channel." Nothing in the Ordinance or the ballot pamphlet put voters on notice that "channel" in Measure G is used in the technical sense of the 1984 Cable Act.

Voters who were aware of the "channel" language must have had the ordinary, "colloquial" meaning of "channel" in mind when they approved Measure G in 2008. This meaning is consistent with appellants' advertisement, "Watch Live and On-Demand TV from 85+ top channels." (Bold omitted.)

Appellants claim that for 14 years, from 2008 until 2022, City failed to enforce the Ordinance against the providers of video streaming. Appellants argue: "The most obvious explanation for fourteen years of inaction is [that] . . . Santa Barbara never believed the [video users' tax] applied to Internet streaming – until it suddenly changed course in 2022. . . . That is strong evidence that the [tax], properly interpreted, does not apply to Appellants."

"But past nonenforcement does not necessarily reflect a formal administrative interpretation *precluding* enforcement. . . . [¶] More importantly, taking it as true . . . that [City had] not previously enforced [the Ordinance against the providers of video

15

streaming] . . . , that is an insufficient basis on which to find the statute *precludes* it from doing so. . . . Its previous lack of enforcement does not rewrite the [Ordinance]." (*Siskiyou County Farm Bureau v. Department of Fish & Wildlife* (2015) 237 Cal.App.4th 411, 443.)

*Internet Tax Freedom Act*

Appellants claim the Ordinance violates the anti-discrimination provisions of the federal Internet Tax Freedom Act (ITFA). (47 U.S.C. § 151 note.) The violation allegedly occurs because the Ordinance taxes video streaming but does not tax "those who watch the same video content [by purchasing or renting a DVD] from a brick-and-mortar retailer (*i.e.*, DVD stores or Redbox kiosks)." This is an issue of first impression.

"Section 1101(a)(2) of the ITFA prohibits a state from imposing 'discriminatory taxes on electronic commerce.' [Citation.] Section 1105(2)(A)(ii) defines a discriminatory tax, in pertinent part, as 'any tax imposed by a State or political subdivision thereof on electronic commerce that . . . is not generally imposed and legally collectible at the same rate by such State or such political subdivision on transactions involving similar property, goods, services, or information accomplished through other means.' [Citation.] 'Electronic commerce' is defined in section 1105(3) as 'any transaction conducted over the Internet . . . comprising the sale . . . of property, goods, [] services[, or information].' [Citation.] Thus, under the ITFA, a discriminatory tax exists only when similar property, goods, services, or information are taxed when purchased electronically but not when purchased offline, or when the tax on electronic purchases is imposed at a different rate or on different persons." (*Labell v. City of Chicago* (Ill. App. 2019) 147 N.E.3d 732, 748.)

16

The trial court ruled that there was no violation of the ITFA because of the lack of similarity between a video streaming subscription and the purchase or rental of a DVD. The court reasoned: "When a consumer is involved in the purchase or rental of a DVD at a brick-and-mortar store, the transaction involves acquiring a physical DVD of a video (a good, rather than a service) for use with a DVD player. When a consumer is involved in the purchase of video streaming services as provided by [appellants], the transaction involves a subscription (a service, rather than a good). The subscription service acquired by such a consumer is qualitatively different in a real and substantial way from the good that is acquired by a consumer in the DVD transaction. [¶] By way of contrast, if a local agency imposed a tax on the purchase of DVDs over the internet, but did not impose such a tax on the purchase of DVDs at a brick-and-mortar store, that tax would be discriminatory because the goods involved in the transaction would be similar at the time of taxation. Indeed, the purpose of the . . . Ordinance was to . . . create a level playing field as between cable-supplied video services and internet-supplied video services, taxing these similar services equally."

In its amicus brief, the California Taxpayers Association (CalTax) disputes the trial court's "similarity" analysis. CalTax argues that, for purposes of the ITFA, what matters is video content, and the content is the same whether it is provided by internet streaming or by a DVD purchased from a brick-and-mortar store: "The similarity test requires an examination of the actual content being delivered, regardless of whether the content is 'property,' a 'service,' 'goods,' or 'information.' In the instant case, the content is video entertainment, such as movies, and

17

whether it should be construed as property, a service, or goods, it is in any event information."  The ITFA applies to "any tax imposed . . . on electronic commerce that . . . is not generally [imposed and collectible or] imposed and . . . collectible at the same rate . . . on transactions involving similar property, goods, services, *or information* accomplished through other means . . . ." (ITFA, § 1105(2)(A)(i), (ii), italics added.)

In attempting to explain why the trial court's "similarity" analysis is flawed, CalTax presents the following hypothetical: "Consider . . . the consumer who wants to view the movie 'Jaws'. She has a television screen in her living room with two boxes connected to it; one an internet router and the other a DVD player.  She has two choices in how she obtains access to the movie.  One way is to go down to the local store and rent a copy of 'Jaws' on a DVD.  The other way is to subscribe to one of Appellants' streaming services and stream 'Jaws' from the internet.  Either way, she gets to watch the same movie.  It cannot be argued credibly that the 'Jaws' movie the consumer watched while streaming it from the internet is not similar to the 'Jaws' movie she watched after putting the DVD in the player. Thus, even though the method of delivering the content here is different (internet compared to DVD), that same content satisfies the similar[ity] requirement."

We conclude the trial court has the better reasoned analysis.  A DVD is tangible personal property that can store video programs.[9]  The ITFA does not preclude cities from taxing

---

[9] "The DVD (digital video disc or digital versatile disc) is a digital optical disc data storage format. . . .  The medium can store any kind of digital data and has been widely used to store video programs (watched using DVD players), software and other

the online sale of tangible personal property, such as a DVD, so long as the same tax would be imposed if the property were sold offline. Video streaming delivers a service that is not tangible personal property. Irrespective of the content of the video streaming, the delivery of this service and the sale or rental of a digital storage device are not "similar" within the meaning of the ITFA.

Moreover, the sale or rental of a DVD from a brick-and-mortar store in Santa Barbara is subject to a 9.25 percent sales or use tax <https://cdtfa.ca.gov/taxes-and-fees/rates.aspx>[10] [as of Oct. 21, 2025], archived at <https://perma.cc/E27W-9Y96>. Imposing an additional 5.75 percent tax under the Ordinance would subject the sale or rental of DVDs to double taxation.

Thus, the absence of a video users' tax on the sale or rental of DVDs from brick-and-mortar stores does not discriminate against electronic commerce in violation of the ITFA. In their amicus brief the six law professors aptly observe, "[T[he local cable operator is already subject to [the video users' tax] and nothing in the ITFA requires that its online competitor [providers of video streaming services] remain immune from tax without unwarranted expansion of the clear meaning of the ITFA."[11]

computer files" <https://en.wikipedia.org/wiki/DVD> [as of Oct. 21, 2025], archived at <https://perma.cc/LH75-SH2G>.

[10] We grant City's request to take judicial notice of Title 4, Chapters 4.12 and 4.14 of the Santa Barbara Municipal Code. These chapters concern City's imposition of sales and use tax on tangible personal property.

[11] As requested by City, we decline to consider CalTax's argument that "[t]he trial court improperly failed to address the issue that, because the [video users' tax] collection requirement

19

*First Amendment*

Appellants contend the Ordinance violates the First Amendment of the United States Constitution because "[i]t taxes speech (Internet video) solely because of its speech-based characteristics" and "it levies a tax solely based on the content of what is distributed."

"The First Amendment, applicable to the States through the Fourteenth Amendment, prohibits the enactment of laws 'abridging the freedom of speech.' [Citation.] Under that Clause, a government, including a municipal government vested with state authority, 'has no power to restrict expression because of its message, its ideas, its subject matter, or its content.' [Citation.] Content-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." (*Reed v. Town of Gilbert, Ariz.* (2015) 576 U.S. 155, 163 (*Reed*).)

"Cable television provides to its subscribers news, information, and entertainment. It is engaged in 'speech' under the First Amendment, and is, in much of its operation, part of the 'press.'" (*Leathers v. Medlock* (1991) 499 U.S. 439, 444 (*Leathers*).) Providers of internet streaming, such as appellants, are similarly engaged in First-Amendment-protected speech.

The Ordinance's taxation of internet streaming is not a content-based regulation of speech. "Government regulation of speech is content based if a law applies to particular speech

does not apply to satellite television providers, it discriminates against electronic commerce when applied to appellants." (Bold and capitalization omitted.) This argument was not made by appellants in their opening brief. (See *ante*, fn. 3 at pp. 3-4.)

20

because of the topic discussed or the idea or message expressed. [Citations.]  This commonsense meaning of the phrase 'content based' requires a court to consider whether a regulation of speech 'on its face' draws distinctions based on the message a speaker conveys."  (*Reed*, *supra*, 576 U.S. at p. 163.)  The Ordinance does not apply to "particular speech because of the topic discussed or the idea or message expressed."  (*Ibid*.)

"Our precedents have also recognized a separate and additional category of laws that, though facially content neutral, will be considered content-based regulations of speech: laws that cannot be "'justified without reference to the content of the regulated speech,'" or that were adopted by the government 'because of disagreement with the message [the speech] conveys,' . . . ."  (*Reed*, *supra*, 576 U.S. at p. 164.)  The Ordinance does not fall into this category of laws.

"[T]here is no indication . . . that [City] has targeted [internet streaming] in a purposeful attempt to interfere with [streamers'] First Amendment activities.  Nor is the tax one that is structured so as to raise suspicion that it was intended to do so."  (*Leathers*, *supra*, 499 U.S. at p. 448.)  The Ordinance taxes video services regardless of their "'message, [their] ideas, [their] subject matter, or [their] content.'"  (*Reed*, *supra*, 576 U.S. at p. 163.)  As the hearing officer observed, "the [video users'] tax simply 'modernizes' and extends the former cable tax to video services that use other, newer technologies."

*California Constitution*

"In November 1996, the California voters adopted Proposition 218 and amended the California Constitution to limit local government taxation by adding article XIII C and article XIII D."  (*AB Cellular LA, LLC v. City of Los Angeles* (2007) 150

Cal.App.4th 747, 755 (*AB Cellular*).)  Article XIII C, section 2(b) provides that the electorate must approve by majority vote any increase in a local government general tax.  The Ordinance was approved by the electorate in 2008, but City did not enforce the Ordinance against appellants until 2022.  Appellants argue that the electorate must approve the delayed enforcement because "Santa Barbara changed its methodology with its decision to expand its tax base and collect the [video users' tax] from Internet Streamers."

Appellants rely on Government Code section 53750, subdivision (h)(1)(B), which provides that, for purposes of Article XIII C, a tax is increased if an agency "[r]evises the methodology by which the tax . . . is calculated, if that revision results in an increased amount being levied on any person . . . ."  The word "'methodology[]' . . . refers to a mathematical equation for calculating taxes that is officially sanctioned by a local taxing entity.  In most instances, the equation will be established by legislative action, such as the enactment of an ordinance."  (*AB Cellular*, *supra*, 150 Cal.App.4th at p. 763.)  "The word 'calculated' denotes the math behind a tax.  The dictionary definition of 'revision' is 'alteration.'  In practical terms, a tax is increased if the math behind it is altered so that either a larger tax rate or a larger tax base is part of the calculation."  (*Ibid*.)

"Under this construction, a local taxing entity can enforce less of a local tax than is due under a voter-approved methodology . . . and later enforce the full amount of the local tax due under that methodology without transgressing Proposition 218.  While the settlement of local tax disputes and enforcement of local taxes may be taxpayer specific, the methodology for the maximum recovery of local taxes will remain constant.  A local

22

taxing entity could even revise its methodology to decrease local taxes and then do an about-face and return to the previously approved methodology. Proposition 218 allows it. The evil to be counteracted is the increase of local taxes beyond what was formerly approved." (*AB Cellular*, *supra*, 150 Cal.App.4th at pp. 763-764.)

City did not increase the video users' tax beyond what was approved by the electorate in 2008. The methodology or math behind the tax remained the same. By enforcing the tax against appellants, City did not enlarge the tax base. Appellants were included in the existing tax base because for a fee they provided video services to Santa Barbara homes and businesses.

Appellants assert, "Like the [tax] increase in *AB Cellular*, Santa Barbara's decision to tax Internet streaming was a tax 'increase,' and Proposition 218 required a vote." But *AB Cellular* is distinguishable on its facts. There, in 1993 before the enactment of article XIII C, the Los Angeles (L.A.) City Council amended its municipal code to impose a tax on cell phone use. "[L.A.] signaled that the cell tax would be calculated by multiplying the tax base of monthly charges plus charges for cell phone calls that originated or terminated in [L.A.] by 10 percent. At the same time, [L.A.] effectively announced that it would not enforce the cell tax as to charges for cell phone calls that originated or terminated in [L.A.] until the carriers developed the technology to track those calls. Then, in 2002, the final instructions hailed a sea change and [without voter approval] revised the methodology to alter the tax base to include cell phone calls that neither originated nor terminated in [L.A.]. [L.A.'s] new equation for calculating the amount of cell tax due was to multiply the monthly charges plus charges for cell phone

23

calls originating or terminating in [L.A.] *plus charges for cell phone calls that did not originate or terminate in [L.A.]* by 10 percent. In other words, a new variable was added. By any definition, adding a variable revised the methodology." (*AB Cellular*, *supra*, 150 Cal.App.4th at p. 761.) In contrast to *AB Cellular*, City's delayed enforcement of the tax against appellants did not add a "new variable" to the methodology for calculating the video users' tax.

*Notice Requirements of Public Utilities Code section 799*

Appellants assert: "[City] . . . failed to notify service suppliers when it decided to collect the [video users' tax] on the use of Internet video streaming. . . . According to Public Utilities Code section 799, . . . the City cannot seek any [video users' tax] amounts from Appellants until it cures this failure."[12] City's "decision . . . 'ma[de] . . . changes to the tax that would affect the collection and remittance of the tax,' and also 'change[d] the tax base,' so 60 days' notice was required" under section 799, subdivision (a)(5).[13] In addition, "City's decision to expand the

---

[12] All further statutory references are to the Public Utilities Code.

[13] Section 799, subdivision (a)(5) provides in relevant part: "If a local jurisdiction repeals the tax, reduces an existing tax rate, changes the tax base, or makes any other changes to the tax that would affect the collection and remittance of the tax, the local jurisdiction shall submit, on and after the effective date of the enactment of the change, a written notification and supply all requisite information to the public utility or service supplier, in accordance with the procedures established by the public utility or service supplier. The public utility or other service supplier shall not be required to implement the changes any earlier than 60 days from the date on which the public utility or other service

24

[video users' tax] to Internet streaming effectively adopted a new tax . . . ." Thus, City violated section 799, subdivision (a)(6), which imposes a "90-day notice requirement [for a new tax]."[14] City acknowledges that it "did not send notices to Appellants under section 799."

The hearing officer responded to appellants' argument as follows: "The City did not send § 799 notices to Appellants because it had no reason to do so. . . . ESPN+ and Disney+ did not start operating in the City until 2018 and 2019, at least a decade after the . . . Ordinance was adopted by a majority vote. [Record citation.] Hulu did exist in 2008, at that time as a free service with no [video users' tax] due from its subscribers. Hulu began offering paid video services in 2010. [Record citation.] [¶] Appellants essentially contend that § 799 imposes a

---

provider receives the written notification and all other information required by the public utility or other service supplier."

[14] Section 799, subdivision (a)(6) provides: "If a local jurisdiction adopts a new tax, the local jurisdiction shall submit, on and after the effective date of the adoption of the new tax, a written notification to the public utility or other service supplier, in accordance with procedures established by the public utility or other service supplier, requesting that the tax be collected. The public utility or other service supplier shall not be required to begin collecting the tax any earlier than 90 days from the date on which the public utility or other service provider receives written notification and all other information required by the public utility or other service supplier. . . . Nothing in this section shall be construed to prevent the public utility or other service provider from beginning the tax collection at an earlier date."

25

preemptive and perpetual obligation on local jurisdictions to provide advance notice to every service supplier that enters the market, even those that do so (like [appellants]) . . . after the adoption of a tax is enacted.  This interpretation would require notice of every applicable tax to every potential new provider.  Section 799's purpose and text, as well as the structure of § 799's notice requirements, cannot be contorted to fit that construction."

Appellants contend that the hearing officer's reasoning is inapplicable because "[n]otice was triggered here by the City's change in tax policy, and not by the entrance of any new market participant. . . .  City never notified Appellants of this change in enforcement policy . . . ."  City's "2022 decision to start collecting the [video users' tax] on internet video streaming" obligated it to provide notice to appellants pursuant to section 799.

In requiring appellants to pay the video users' tax, City did not "change[] the tax base, or make[] any other changes to the tax that would affect the collection and remittance of the tax . . . ."  (§ 799, subd. (a)(5).)  Nor did it "adopt[] a new tax."  (*Id*., subd. (a)(6).)  City merely enforced against appellants the existing video users' tax as set forth in the Ordinance.  We previously explained: "By enforcing the tax against appellants, City did not enlarge the tax base.  Appellants were included in the existing tax base because for a fee they provided video services to Santa Barbara homes and businesses."  (*Ante*, at pp. 21-22.)

Section 799, subdivision (a)(5) significantly refers to the "enactment" of a change in the tax: "If a local jurisdiction repeals the tax, reduces an existing tax rate, changes the tax base, or makes any other changes to the tax that would affect the collection and remittance of the tax, the local jurisdiction shall submit, on and after the effective date of the *enactment* of the

26

change, a written notification and supply all requisite information to the public utility or service supplier . . . ." (Italics added.) "'[E]nact' means 'to establish by legal and authoritative act: make into a law; *esp*: to perform the last act of legislation upon (a bill) that gives the validity of law.'" (*Thornton v. California Unemployment Ins. Appeals Bd.* (2012) 204 Cal.App.4th 1403, 1422, fn. 8.)  City did not "enact" a change in the video users' tax when it notified appellants in 2022 that they had failed to collect and pay the tax.  (See *River Garden Retirement Home v. Franchise Tax Bd.* (2010) 186 Cal.App.4th 922, 949-950 [Franchise Tax Board "did not 'enact' anything" when it sent deficiency assessments to plaintiff disallowing tax deduction taken for prior years].)

Accordingly, City was not obligated to provide notice to appellants pursuant to section 799.[15]

### *Disposition*

The judgment is affirmed.  City shall recover its costs on appeal.

---

[15] We need not consider City's claim that "Appellants were not entitled to receive section 799 notices because they had no procedures for the delivery of such notices." (Bold omitted.) Section 799, subdivision (a)(5) provides that the local jurisdiction shall give "written notification . . . to the public utility or service supplier, *in accordance with the procedures established by the public utility or service supplier*." (Italics added; accord, § 799, subd. (a)(6).)

27

CERTIFIED FOR PUBLICATION.


                                    YEGAN, Acting, P. J.

We concur:


        BALTODANO, J.


        CODY, J.


28

Donna D. Geck, Judge

Superior Court County of Santa Barbara

————————————————

Wilson Sonsini Goodrich & Rosati and Victor Jih, Russell Kostelak, Ian Sprague, Christopher Hurley, Mark Yohalem, for Plaintiffs and Appellants.

Jonathan M. Coupal, Timothy A. Bittle, Amy C. Sparrow, for amicus curiae, Howard Jarvis Taxpayers Association, on behalf of Appellants.

Eversheds Sutherland and Jeffrey A. Friedman, for amicus curiae, Motion Picture Association, Inc. & Streaming Innovation Alliance, on behalf of Appellants.

McDermott Will & Emery and Charles J. Moll III, Stephen P. Kranz, Mark E., Nebergall, for amicus curiae, California Taxpayers Association, on behalf of Appellants.

Jarvis Fay and Benjamin P. Fay, Gabriel McWhirter, Tatyana Leskowicz; City Attorneys Office City of Santa Barbara and Sarah J. Knecht, City Attorney, Tom R. Shapiro, Assist. City Attorney, for Defendant and Respondent.

Colantuono, Highsmith & Whatley and Holly O. Whatley, Meghan A. Wharton, for amicus curiae, League of California Cities and California State Association of Counties, on behalf of Respondent.

Darien Shanske, for amicus curiae, on behalf of Respondent.